UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                |

RAYMOND BROWN,                 |

              Petitioner,     |

                            |     06 Civ. 2574 (KMW) (DFE)

    -against-           |

                            |     <u>OPINION AND ORDER</u>

JAMES CONWAY, Superintendent of   |
Attica Correctional Facility,     |

             Respondent.    |

------------------------------------------------------------X
KIMBA M. WOOD, U.S.D.J.:

    <u>Pro se</u> Petitioner Raymond Brown, a New York state prisoner convicted, following a jury trial, of two counts of attempted murder and other weapons-related offenses, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner asserts three claims:  (1) the trial court improperly found that defense counsel's explanation for the exercise of a peremptory challenge was pretextual under <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986); (2) the trial court improperly permitted the jury to consider evidence of an uncharged crime; and (3) the trial court abused its discretion in curtailing defense counsel's ability to effectively cross-examine one of the prosecution's witnesses.

    For the reasons discussed below, the Court DENIES the petition.  (Dkt. No. 2.) As to Petitioner's <u>Batson</u> claim, Petitioner has failed to establish, by clear and convincing evidence, that the trial's judge's finding of pretext was erroneous.  Petitioner's remaining claims fail, because they assert challenges to state evidentiary rulings that are not cognizable on habeas review, and because the judge's rulings did not "so infuse[ ] the

trial with unfairness as to deny due process of law."  See Estelle v. McGuire, 502 U.S. 62, 68, 75 (1991).


**BACKGROUND**

On January 8, 2000, Petitioner was arrested for the November 2, 1999 murder of Dwayne Hamilton.  Ballistics tests on shell casings recovered from the scene confirmed that the same gun that was used in the Hamilton shooting had been used in two earlier shootings:  the April 11, 1999 shooting of Xavier Roman and the May, 14 1999 shooting of Charles Cox.  While in custody, Petitioner was questioned by detectives and gave a videotaped statement that, although focused on the November 1999 incident, contained admissions as to all three shootings.

On January 24, 2000, a Bronx County grand jury charged Petitioner with one count of murder in the second degree in connection with the November 1999 Hamilton murder (Indictment No. 425/00).  A second indictment was filed in April 2001, charging Petitioner with two counts of attempted murder and other weapons-related offenses in connection with the April and May 1999 shootings (Indictment No. 1786/01).  Justice Phyllis Bamberger, Supreme Court, Bronx County, denied the prosecution's motion to consolidate the indictments, and trial on Indictment No. 1786 (the two attempted murders) went to trial first.[1]  (May 9 Tr. 2-23; May 10 Tr. 24-70.)   The record from that

---

[1] On June 4, 2001, a week after the jury convicted Petitioner on Indictment No. 1786, Petitioner pled guilty to one count of murder in the second degree (Indictment No. 425), in exchange for a promised minimum sentence of 15 years to life imprisonment, to run concurrently with the sentence to be imposed on Petitioner' trial convictions.  Petitioner's habeas petition challenging the legality of his guilty plea is also before this Court.  Brown v. LaClaire, No. 07 Civ. 5906 (KMW).  The Court today denies that petition in a separate opinion and order.

trial, the subject of the instant habeas proceeding, is lengthy and is summarized only to the extent relevant to Petitioner's claims on habeas review.

I.   Proceedings in the Trial Court

   A.   Prosecution's Successful *Batson* Challenge

During jury selection, defense counsel made a number of peremptory challenges to prospective white jurors.  The judge found that there was a prima facie case of discrimination, and rejected, as pretextual, defense counsel's explanations as to two of the challenged jurors.  Those jurors were both seated.  Here, Petitioner challenges the trial judge's finding of pretext with respect to one of the jurors, Mr. Domingo.

At the start of voir dire, the trial court provided prospective jurors with a numbered questionnaire.  The questionnaire asked each prospective juror to provide information regarding, inter alia, his age, residence, level of education, and prior jury service, and whether he could understand and apply "the legal principles, including the presumption of innocence and the state's burden of proving guilt beyond a reasonable doubt."  (Killian Aff.; Ex. 6 (Question #20).)

The judge and the parties examined sixteen jurors in the first panel.  Prospective Juror No. 10, Mr. Domingo,[2] gave the following answers:

> PROSCPECTIVE JUROR:  Number one, sixty-four [age]; Throgsneck; thirty-six years; fifty-one years, fifth grade [level of education], retired.
> THE COURT:  And what did you do Sir, before you retired.
> PROSPECTIVE JUROR:  I was a truck driver.
> THE COURT:  Okay.
> PROSPECTIVE JUROR:  Wait a minute.  I'm retired, okay, I have two children, thirty-seven and forty-one, they housewives, number twelve, nobody; number thirteen, no; fourteen, no; fifteen, no; sixteen, no; seventeen, civil case; eighteen, no.  I like to swim, bike, and walk, and number twenty, I'm undecided.  I really don't understand exactly what it means.

---

[2] The juror's name was variously transcribed as "Mr. Domoni" or "Mr. Domini."

> THE COURT:  Okay, well thank you for saying that.  The first princip[le] is that everyone must consider and believe the Defendant to be innocent of the charges.  That's called the presumption of innocence.
>
> The second rule is that the district attorney is responsible [to provide] evidence here in the courtroom . . . and the evidence has to convince the jurors that the crimes charged are proven beyond a reasonable doubt . . . .
>
> The Defendant doesn't have to prove or disprove anything.  He doesn't have to produce evidence [be]cause the burden is on the district attorney to prove the charges beyond a reasonable doubt.  Do you understand the rules now?
> PROSPECTIVE JUROR:  <u>Okay, thank you</u>.
> THE COURT:  Okay, and can you follow them here?
> PROSPECTIVE JUROR:  <u>I think so.</u>

(V.D. 115-17) (emphasis added).

The judge asked the parties, outside the presence of the prospective jurors, if there were any challenges to the first twelve prospective jurors for cause.  The prosecution challenged one juror, Mr. Diaz (Prospective Juror No. 11) on the ground that "his ability to speak English is . . .  problematic."  (V.D. 168)  Defense counsel did not object to the challenge.  He stated that he did not recall a language difficulty, but stated instead that the juror was "not sure whether he [understood or] could apply the [legal] princip[le]s."  (<u>Id.</u>)  The judge agreed and excused the juror for cause.  Defense counsel made no challenges for cause in this round.

The judge continued: "Okay, now before we start the peremptory, I just want to put everybody on notice about <u>Batson</u> issues here, so just be careful what you do.  Go ahead.  You better be ready."  (VD. 169)   With respect to the eleven jurors in this group, the prosecution exercised one peremptory challenge, and defense counsel exercised six peremptory challenges.  Defense counsel challenged prospective jurors No. 1 (Mr. Calabrese), No. 2 (Mr. Fogarty), No. 3 (Ms. Churman), No. 5 (Ms. Gonzalez), No. 6 (Ms. Engel), and No. 10 (Mr. Domingo).  The prosecutor promptly registered a <u>Batson</u>

4

challenge, observing that:  "I think we pretty much got rid of all the Caucasians with one

swoop."[3]  (V.D. 170)  The court found, after deciding to classify "Hispanic" jurors as

"White," that the prosecution had established a prima facie case of discrimination.

Next, when asked to provide reasons for each of the challenges, defense counsel

explained that Mr. Calabresi had prior experience issuing summonses and was the

"functional equivalent of a law enforcement official"; that Mr. Fogerty and Ms. Engel

had both been the victims of robberies, and that Ms. Engel had previously testified before

a grand jury; and that Ms. Churman's daughter had been the victim of a crime.  Defense

counsel then explained his challenge to Mr. Domingo, Prospective Juror No. 10, as

follows:

> DEFENSE COUNSEL: . . . although he's only 64 years of age, if that's
> what I recollect, he said he had some problems in understanding the
> princip[le]s.  He wasn't sure.  Your Honor had to reiterate them for him
> and again he said okay . . . I'm saying he's only 64, he doesn't seem like
> he's that alert and I point to the issue, the fact that he didn't understand
> some of the princip[le]s.  He wasn't sure he could apply them.
> THE COURT:  He didn't say that.
> DEFENSE COUNSEL:  He said not sure.
> THE COURT:  He didn't say he wasn't sure, he said he wasn't sure
> whether he <u>understood</u> them. . . .  And when I re-explained them to him he
> understood them.  Go ahead, what else?
> DEFENSE COUNSEL:  I just felt that he doesn't quite comprehend.  I am
> not confident that he comprehends these princip[le]s.

(V.D. 172-73.)

When asked to respond to defense counsel's proffered reasons, the prosecutor,

starting with Mr. Domingo, stated:  "[Mr. Domingo] asked you a question, Judge, you

explained it.  He said <u>definitively</u> I can follow the law and I understand what [question

20] means and it's not a problem.  I'm not sure I agree with [defense counsel's]

---

[3] Prospective jurors numbers 1, 2, and 6 were Caucasian, number 3 was Asian (or, as the judge
put it, possibly "Indo-European"), and numbers 5 and 10 were Hispanic.  (V.D. 170-71; 182)  Mr.
Cruz, prospective juror number 4, was the only White juror not challenged by defense counsel.

characterization of what this gentleman said." (V.D. 174.)  (Mr. Domingo's actual answer, after the judge asked again whether he could apply the relevant legal principles was, as noted above, "I think so.")

The prosecutor also disputed the basis for defense counsel's challenges to other jurors, which prompted the judge to comment that:  "Well, there is very little to compare, but I find some of your [defense counsel's] challenges are disingenuous."  (V.D. 176.) After some further colloquy, the judge found that the challenges to Mr. Calabresi, Mr. Fogerty, and Ms. Engel were valid.

The judge then asked defense counsel to provide his reason for challenging Ms. Gonzalez (Prospective Juror No. 5); defense counsel cited, among other things, the fact that she had a ninth grade education.  When the judge pointed out that counsel had also challenged jurors with college degrees, defense counsel noted that Mr. Domingo, who he also challenged, had a fifth grade education.  (VD. 180.)  The judge accepted the challenge to Ms. Gonzalez.

The judge then turned back to Mr. Domingo, and asked defense counsel to remind her of the basis for the challenge.  Defense counsel cited (1) his fifth grade education and (2) that "he said he didn't understand the princip[le]s."  The judge countered:  "Well, that's a new reason, the fifth grade education . . . [and] he said he <u>did</u> understand the principles."  (V.D. 181) (emphasis added).   That prompted the following exchange:

> DEFENSE COUNSEL:  Initially he said he didn't.  The Court then had to reinstruct him.  He said it was ok. It was my judgment and that's why I mentioned the fact that he's only 64 and he seems a little infirm to me.
> THE COURT:  The man swims, bikes, and walks and  . . . [h]e seems infirm to you?
> DEFENSE COUNSEL:  Yes.
> THE COURT:  I find that to be – I discredit your reasoning for Mr. [Domingo] and <u>I'll disallow the challenge</u>.

(VD 181-82.)

The judge then solicited challenges to the four remaining members of the first panel.  Defense counsel exercised a peremptory challenge against (another) Ms. Gonzalez (Prospective Juror No. 16), who at that point was the only remaining White member of the panel.  The judge sua sponte reopened her Batson ruling, and asked defense counsel for a reason for the challenge.  The judge found defense counsel's explanation — that she was a homeowner — pretextual, and disallowed the challenge.  (VD 184-86.)  (Petitioner did not challenge this finding on direct appeal, and does not challenge it here.)

The judge and the parties continued to examine prospective jurors the next day. Having already qualified eight jurors, the judge solicited challenges to another group of four prospective jurors.  One juror was dismissed for cause, owing to his "inability to judge police officers."  Defense counsel then sought to exercise a peremptory challenge against Mr. Gotay; the prosecution responded:  "I think it raises yesterday's Batson challenge again.  Once again the only [C]aucasian has been knocked off."  The judge then stated she had an "even more substantial issue" with defense counsel's failure to challenge certain black members of the panel, who, the judge believed, could have been challenged on the same grounds defense counsel gave to justify his challenges to prospective white jurors.[4]   (VD 192-99, 200-01, 237-38.)

---

[4] For example, the judge expressed deep concern about why defense counsel challenged Mr. Fogerty (on the ground that he had been the victim of a crime), but did not challenge Ms. Merchant (who has also been the victim of a crime).  Initially, the judge found defense counsel's explanation for the challenge to Mr. Fogerty pre-textual under Batson.  The judge changed her mind after defense counsel explained that he did not challenge Ms. Merchant because she also stated, in chambers, that a police officer had been "very disrespectful and very rude" to her in issuing a traffic violation and that she "wasn't sure that she could evaluate the testimony of police officers in a fair way." Defense counsel reminded the judge that police officers were "gonna be the witnesses of the prosecution, not mine."  (V.D. 174-79)

After some further colloquy, the judge concluded that the record showed a prima facie case of a "pattern and practice" of discrimination by defense counsel "considering the prior discussions, the prior challenges, the prior numbers."  (V.D. 239)  The judge found defense counsel's explanation of Mr. Gotay's prior service in a murder trial (where the jury convicted) acceptable, but noted that:  "I'm still very disturbed about the other challenge or lack of challenge" to another non-Caucasian juror from the other day.  (VD 239-41.)  The judge continued:  "I have a real difficulty seeing a substantial reason to distinguish between these two people except that one is Afro-American and one is white . . . .  I am really disturbed by your behavior in this case.  I really find it unconscionable."  Defense counsel inquired as to the basis for the court's hostility toward him and his client, during jury selection and in earlier proceedings.  The judge responded:  "the record is made that you have challenged every white juror on this panel."   (V.D. 244.)

B.  Use of Evidence of an Uncharged Crime

Before trial on the attempted murder charges, the court heard arguments on the admissibility of evidence of Petitioner's involvement in, and arrest for, the separately charged November 1999 shooting of Dwayne Hamilton.

The prosecution argued, pursuant to People v. Molineux, 168 N.Y. 264 (1901), New York's leading case on uncharged crime evidence, that evidence of the November 1999 shooting was necessary to (1) establish Petitioner's identity in the two earlier attempted murders, because ballistics analysis confirmed that the same gun was used in all three shootings; and (2) explain the circumstances that led to the ballistics match and why most of the videotaped confession (which lasted some two hours) did not concern the crimes with which Petitioner was charged (regarding which there was about seven

minutes of videotape).  The prosecution agreed to play a redacted copy of the video at trial, and it represented that they would not elicit that, with regard to the November 1999 incident, that anyone was hit by a bullet.  "We won't say the word murder even though that's obviously what occurred.  We won't let the jury know that the victim was even struck."  (Tr. 82-85).

Defense counsel argued that evidence of Petitioner's alleged involvement in the November 1999 shooting was unnecessary to establish identity.  The prosecution planned to introduce ballistics evidence to prove that the same gun was used in the April and May 1999 shootings, and therefore, evidence that the gun was also used in a third shooting would be cumulative.  When asked by the judge if he would concede on the issue of identity, defense counsel objected:  "That's their proof.  It's their proof that the same gun was used on April 11 and . . . May 14."[5]  (Tr. 87-88.)  Defense counsel argued that, in any case, there was no need to tell the jury that the gun was actually used in the November 1999 incident.  The judge responded, however, that evidence that the gun was fired was necessary to explain how the police connected Petitioner to the earlier shootings (i.e., via a ballistics match).

At trial, at least three witnesses testified to Petitioner's involvement in the November 1999 incident:  Police Officer Gonzalez, who responded to the November 1999 shooting, Detective Koch, who analyzed the ballistics for all three incidents, and Detective Carter, who took Petitioner's statements.  Detective Carter testified that the videotaped confession (which was played for the jury in redacted form) was an accurate representation of only Petitioner's admissions of the earlier April 11 and May 14

---

[5] The judge did preclude testimony that Petitioner stabbed a fourth individual, Charles Jenkins, during Petitioner's initial encounter with Mr. Cox in September 1998.  (Tr. 99-102.)

shootings, and that most of the details of the November 1999 incident had been removed. The Court then gave the jury the following limiting instruction, to which there appears to have been no objection:

> Ladies and gentlemen, you heard testimony concerning the fact that not everything that was said about the incident, or alleged incident, at 1048 Morris [the November incident] has been included in the tape. The tape has been redacted because there is no count or charge or accusation before you involving the November 2 alleged incident. However, there is a way in which the law requires that you process the information that was on the tape, and I will give you that final instruction when the case is concluded . . . .

(Tr. 618-19.)

Petitioner's primary defense at trial was self-defense — that in each shooting, the alleged victim was the first to brandish a weapon. Petitioner took the stand and testified as to the November 1999 incident, claiming that Mr. Hamilton was the first to draw a gun, and that Petitioner was then forced to shoot Mr. Hamilton several times. Petitioner's version of events was, defense counsel argued, supported by the fact that the police recovered a gun from Mr. Hamilton's waistband.

Before summations, the judge told the prosecutor to "lower the decibel level on the Hamilton issue," and explained that the evidence was admissible for two limited purposes: (1) as evidence of Petitioner's identity, and (2) to negate Petitioner's claim that he acted in self-defense in all three shootings. (Tr. 1173-74.) In his summation, the prosecutor told the jury that the Hamilton shooting was relevant to (1) explain the circumstances of Petitioner's arrest, which was based in part on the ballistics comparison, and (2) rebut Petitioner's claim of self-defense. With respect to this second purpose, the prosecutor argued:

> Think about this truth.  Most of us, ladies and gentleman, will go through life, or whole lives and never have to use deadly physical force . . . .  This man in a period of seven months uses it three times and wants you to believe he had to.

(Tr. 1322.)  The prosecutor went on to detail the People's version of the November 1999 incident, noting that: "[Petitioner] followed him for several blocks.  He waited until he [Dwayne Hamilton] got to his home . . . the one place we are supposed to be safe from him and then he fired at him at close range just up the steps. . . .  He shot a man multiple times. . . .  He [shot] him until he was unconscious.  He shot him until he was unconscious at the doorway of his own home."  (Tr. 1323) (emphasis added).  The prosecutor then paraphrased Petitioner's story of self-defense, concluding that it was nonsensical and "preposterous."

Finally, the court charged the jury on the Hamilton shooting as follows:

> In this case you have also heard evidence about an alleged incident on November 2, 1999 involving Dwayne Hamilton.  The defendant is not charged with this conduct before you, and you must not speculate or guess or try to figure out why that is the case.  The People do not have to prove that incident beyond a reasonable doubt.
>
> If you accept the evidence about this incident, and that is entirely up to you, you may not use the evidence to show that the defendant had a disposition to commit the crimes charged in this case.[6]  In other words, you cannot say because the defendant did an act on November 2, 1999, that he must have done the acts in April and May of 1999.  The evidence of the November 2, 1999 incident, if you accept it, is used for another purpose.
>
> If you find that defendant used a gun that belonged to him to shoot Mr. Hamilton and that the same gun was used to shoot Mr. Cox and Mr. Roman, you may use that evidence, along with all of the other evidence in the case that you accept, if any, to determine if the People have proven beyond a reasonable doubt that the defendant shot Mr. Cox and Mr. Roman or possessed a gun.

_____

[6] The judge also cautioned the jury against using, as propensity evidence, (1) evidence of a September 1998 street fight that involved Petitioner and Charles Cox, and (2) Petitioner's 1993 drug arrest.  (Tr. 1414-16.)

(Tr. 1413-14) (emphasis added).  The record indicates that the Court showed its proposed charge to both parties, and that there was no objection.  (Tr. 1369)

    C.  <u>Cross-Examination of Victim</u>

Petitioner's final claim is that the trial court should have admitted certain prior statements made by a victim, Mr. Roman, that were allegedly inconsistent with Mr. Roman's testimony at trial.  These statements concerned Mr. Roman's recollection of certain of the details of the May 1999 shooting.  For example, Mr. Roman allegedly told a police detective at the hospital after the shooting that the gun used to shoot him was a "grey-colored handgun" (whereas, at trial, Mr. Roman testified that the gun was black).  Mr. Roman also allegedly told the detective that he was shot in the leg after having "tripped" inside the store (whereas, at trial, Mr. Roman testified that initially he thought he had tripped when he fell to the ground, but later realized that he did not trip at all, but had been shot in the leg).  (Tr. 749-57.)

The court permitted defense counsel, on cross-examination, to ask Mr. Roman whether he had made the prior allegedly inconsistent statements.  After Mr. Roman denied having made the statements, defense counsel sought to call (as part of the defense case) the police detective to the stand to elicit that Mr. Roman had in fact made the prior statements.  The court denied defense counsel's application.  The court ruled that, although New York law permitted counsel to cross-examine Mr. Roman about the prior statements, the statements were not themselves admissible unless they were also relevant to a material issue at trial.  The court found that these alleged inconsistencies were

relevant only to the witness's "credibility" (and not to any material issue), and therefore they could not be proved by direct evidence at trial.[7]  (Tr. 758.)

   D.  Petitioner's Conviction and Sentence

   On May 30, 2001, the jury convicted Petitioner of two counts of attempted murder in the second degree, two counts of criminal possession of a weapon in the second degree, and two counts of criminal possession of a weapon in the third degree. On August 9, 2001, the court sentenced Petitioner as a second felony offender to an aggregate sentence of fifty years imprisonment (consecutive determinate terms of twenty-five years imprisonment on the attempted murder counts, to run concurrently with terms of fifteen and seven years on each of the second and third degree weapons possession counts).[8]

## II.  Appeals in the State Courts

   Petitioner appealed his trial convictions through his assigned counsel.[9]  His appellate brief argued that the trial convictions should be set aside because (1) in the

---

[7] In light of the court's ruling, defense counsel decided not to call Detective Ramirez.  (Tr. 758-59.)

[8] On June 4, 2001, a week after the jury returned a verdict of guilty on Indictment No. 1786, Petitioner pled guilty to one count of murder in the second degree on Indictment No. 425 (the Hamilton shooting).  On August 9, 2001, Petitioner was also sentenced to a term of imprisonment of from fifteen years to life on this conviction, to run concurrently with the sentences imposed on Petitioner's trial convictions.

[9] Petitioner also moved twice, each time appearing pro se, to vacate his convictions pursuant to New York Criminal Procedure Rules § 440.10.  On October 29, 2002, Petitioner moved the trial court to vacate both his trial and plea convictions, arguing that, inter alia, his status as an illegal alien deprived the court of jurisdiction and that his counsel was ineffective in not raising this defense at trial. On April 28, 2003, the trial court denied the motion.  On June 24, 2004, while his direct appeal was pending, Petitioner moved the trial court to vacate the judgment resulting from his guilty plea, on the ground that he was coerced to plead guilty, because he was convinced, based on the trial judge's conduct during the completed trial on the attempted murder charges, that he could not receive a fair trial in the front of the same judge.  On August 5, 2004, the trial court denied the motion, and on December 23, 2005, the Appellate Division affirmed.  People v. Brown, 24 A.D.3d 271 (1st Dept. 2005).  Petitioner's habeas petition challenging the legality of his guilty plea is also before this Court.  Brown v. LaClaire, 07- Civ-5906 (KMW). The Court today denies that petition in a separate opinion and order.

reverse-<u>Batson</u> context, the judge's step-three finding of pretext was erroneous, and (2) evidence that Petitioner shot a third person, Dwayne Hamilton, was improperly admitted under <u>People v. Molineux</u>, given that Petitioner asserted a justification defense at trial.  In a <u>pro se</u> supplemental brief, Petitioner also raised a third issue:  that the trial court abused its discretion in curtailing defense counsel's ability to effectively cross-examine Mr. Roman.

On December 14, 2004, the Appellate Division, First Department, unanimously affirmed the convictions.  <u>People v. Brown</u>, 13 A.D.3d 145 (1st Dept. 2004).  First, the court held that the trial court properly granted the People's <u>Batson</u> challenge:

> The record supports the court's finding that defense counsel's purportedly race-neutral reasons for exercising a peremptory challenge were pretextual, and this credibility-based finding is entitled to great deference (<u>see</u> <u>People v. Hernandez</u> 75 N.Y.2d 350 (1990), <u>aff'd</u> 500 U.S. 352 (1991)).  Defense counsel's various explanations were either contradicted by the panelist's voir dire responses, or were obvious afterthoughts.

<u>Id.</u> at 145-46.  Second, the court rejected Petitioner's arguments concerning uncharged crime evidence.  The court held that the trial court properly exercised its discretion in admitting evidence that Petitioner shot a third person in November 1999, using the same weapon that the prosecution alleged was used in the charged crimes.  The court determined that the uncharged crime evidence was "highly probative of defendant's identity, and its probative value outweighed any potential for prejudice."  In so doing, the court rejected Petitioner's argument that he had conceded the issue of "identity" when he claimed self-defense:  "[a]t the time the evidence was received, defendant had not conceded the element of identity . . . which was still potentially at issue notwithstanding

the reference to a justification defense in defendant's opening statement."[10]  The

Appellate Division also noted that any prejudice was minimized by the court's use of a

limiting instruction, and that any error in the admission of the evidence was harmless in

light of the "overwhelming evidence" of Petitioner's guilt.  Brown, 13 A.D.3d at 146.

Finally, the Appellate Division stated that it "considered and rejected defendant's

remaining claims, including those contained in his pro se supplemental brief."  Id.

On March 11, 2005, the New York Court of Appeals denied Petitioner leave to

appeal.  People v. Brown, 4 N.Y.3d 828 (2005).

III.  Habeas Petition

In a habeas petition dated March 16, 2006, Petitioner raises the same claims

advanced by his assigned appellate counsel on direct appeal, as well as the third claim

that was advanced in his pro se supplemental brief.   See Pabon v. Wright, 459 F.3d 241,

248 (2d Cir. 2006) (when a petitioner appears pro se, the court must construe his pleading

liberally and interpret them "to raise the strongest arguments they suggest").

Respondent argues (1) that the state court's resolution of Petitioner's reverse-

Batson claim was not contrary to, or an unreasonable application of, clearly established

federal law, and (2) that Petitioner's Molineux claim is not cognizable on habeas review

because it concerns a state evidentiary ruling, and in any event, the state court's decision

to allow such evidence was not contrary to, or an unreasonable application of, clearly

established federal law.  Respondent's brief does not address Petitioner's abuse of

discretion claim, which was raised for the first time in this Court in Petitioner's reply.[11]

---

[10] The Appellate Division's decision did not address the second permitted use of the Hamilton
shooting at trial, to wit, as evidence that Petitioner's claim of self-defense was incredible.
[11] In a Memorandum and Order dated June 12, 2007, Magistrate Judge Eaton denied Petitioner's
application for counsel pursuant to 18 U.S.C. 3006(A)(g).  (Dkt. No. 17.)  By order dated

**DISCUSSION**

I.  Standard of Review

   Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), if a habeas petitioner's claim was "adjudicated on the merits in State court proceedings," a federal court can grant habeas relief only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. § 2254(d).

   An "adjudication on the merits" is one that (1) disposes of the claim on substantive grounds, and (2) reduces that disposition to judgment.  Bell v. Miller, 500 F.3d 149, 154-55 (2d Cir. 2007); Eze v. Senkowski, 321 F.3d 110, 121-22 (2d Cir. 2003).  In this case, Petitioner's claims were raised on direct appeal, and the Appellate Division rejected these claims on the merits.  The Appellate Division's decision, therefore, is an adjudication on the merits entitled to AEDPA deference.

   A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or the state court "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Court's]."  Williams v. Taylor, 529 U.S. 362, 405 (2000).  A state court's decision is an "unreasonable application of" clearly established federal law when the decision "correctly identifies the governing legal rule," but "applies [the rule] unreasonably to the facts of the particular prisoner's case."  Id. at 412-13.  The Second Circuit has observed

_____

November 6, 2007, this Court withdrew the Order of Reference with respect to the habeas petition.  (Dkt. No. 18.)

that the "unreasonable application" standard "falls somewhere between merely erroneous and unreasonable to all reasonable jurists." Brown v. Alexander, 543 F.3d 94, 100 (2d Cir. 2008). "Although some increment of incorrectness beyond error is required, . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Id. (internal quotation marks omitted).

Finally, under section 2254(d)(2), state court factual findings are "presumed to be correct" and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. Id.

II. Analysis of Petitioner's Habeas Claims

A. Petitioner's Reverse-*Batson* Claim

The Equal Protection Clause prohibits both the prosecution and defense from exercising peremptory challenges in a racially discriminatory manner. See Georgia v. McCollum, 505 U.S. 42, 59 (1992); Batson v. Kentucky, 476 U.S. 79, 96-97 (1986). To determine whether such discrimination has taken place, the trial court conducts a three-step inquiry. Where the prosecution has challenged defense counsel's use of peremptory strikes (the reverse-Batson scenario), the prosecution must first make a prima facie showing that defense counsel excused one or more jurors on the basis of race. If that showing is made, defense counsel must then articulate race-neutral explanations for challenging the jurors in question. Finally, at the third stage, the trial court must determine whether the prosecution has met its burden of proving purposeful discrimination, i.e., that defense counsel's "proffered reason was pretextual." See United States v. Brown, 352 F.3d 654, 660 (2d Cir. 2003) (citing Batson, 476 U.S. at 97-98).

The Supreme Court has explained that the final step in the <u>Batson</u> inquiry turns on a "pure issue of fact," <u>i.e.</u>, whether counsel intended to discriminate.  <u>Miller-El v. Cockrel</u>, 537 U.S. 322, 339 (2003) (<u>citing</u> <u>Hernandez v. New York</u>, 500 U.S. 352, 364-65 (1991) (plurality)).  Because this dispute "largely . . . turn[s] on evaluation of counsel's credibility," the trial court is in the best position to make this evaluation and its findings of fact are "of the sort accorded great deference on appeal."  <u>Miller-El</u>, 537 U.S. at 339 (<u>quoting</u> <u>Batson</u>, 476 U.S. at 98 n.21); <u>see also</u> <u>id.</u> ("There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.  As with the state of mind of a juror, evaluation of the [counsel's] state of mind based on demeanor and credibility lies peculiarly within a trial judge's province.") (internal quotations marks omitted).  Section 2254's deferential standard of review assures that the federal court will give the required deference to the trial court's determination of counsel's credibility.  <u>Id.</u>

In this case, there is some basis to question the trial judge's finding that defense counsel's reasons for challenging Mr. Domingo were pretextual.  However, as set forth below, the Court cannot conclude, in the context of the entire record, that this finding was unreasonable.  The first reason defense counsel gave in support of the challenge was Mr. Domingo's alleged difficulty in understanding and applying the "legal principles," identified in the jury questionnaire as the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt.  The judge disagreed with defense counsel's characterization of Mr. Domingo's responses, stating that, after the court explained these concepts to Mr. Domingo (who had requested clarification), Mr. Domingo responded that he understood the principles and could apply them.

Based on the transcript alone, it appears that Mr. Domingo was tentative (even after the judge's explanation) in responding to the questions.  As stated above, when Mr. Domingo was asked whether he understood the principles, Mr. Domingo said, "Okay, thank you," and when asked whether he could apply them, he said "I think so."  (V.D. 117.)  Although it would have been far preferable for the court to have followed up by asking Mr. Domingo whether he was confident that he understood and apply these fundamental legal principles, the trial court was in a position to evaluate whether the juror understood and could apply these principles based on the juror's demeanor and tone of voice.  The court's decision to discredit defense counsel's explanation also followed the court's observation of defense counsel's behavior during jury selection, most significantly defense counsel's repeated challenges to other white jurors and his failure to challenge black jurors who apparently could have been challenged on similar grounds.   It is in this context that the trial court concluded, ultimately, that defense counsel's stated reason for challenging Mr. Domingo was pretextual.  There is not clear and convincing evidence in the record to upset this factual finding.

Defense counsel's second reason for challenging Mr. Domingo — his fifth grade level of education — was discredited by the court because, inter alia, defense counsel did not mention Mr. Domingo's level of education initially as a basis for the challenge.  It was, in the court's view, a mere afterthought.  The judge's decision in this regard, based on direct observation of the litigants, is entitled to great deference on appeal, and there is not clear and convincing evidence in the record to upset this finding.

For these reasons, the Appellate Division's decision affirming the trial judge's finding of pretext was not an "unreasonable application" of the Supreme Court's Batson

jurisprudence, and "was not based on an unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. § 2254(d).

B.  <u>Petitioner's Uncharged Crime Claim</u>

Petitioner, as he did on direct appeal, claims that the trial court violated the mandate of <u>People v. Molineux</u>, 168 N.Y. 264 (1901), by permitting the People to elicit evidence of an uncharged crime.

It is well settled that "it is not the province of a federal habeas court to re-examine state law determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  <u>Estelle v. McGuire</u>, 502 U.S. 62, 68 (1991); <u>see</u> 28 U.S.C. § 2254(a).

In <u>Estelle</u>, the Supreme Court rejected petitioner's claim that the trial court's admission of alleged prior "bad act" evidence — to prove what is referred to, in Calfornia, as "battered child syndrome" — violated any of petitioner's constitutional rights.  The Court first noted that its habeas powers did not allow it to reverse the petitioner's conviction "based on a belief that the trial judge incorrectly interpreted the California Evidence Code in ruling that the prior injury evidence was admissible as bad acts evidence in the case."  <u>Id.</u> at 72.  The Court also found that the admission of the prior "bad act" evidence did not violate petitioner's due process rights, because the evidence was relevant to an issue in the case, to wit, petitioner's intent to commit the crime charged.  <u>Id.</u> at 69-70.  The Court held that that challenge to a state evidentiary ruling was not properly reviewable in the habeas context, because "the introduction of the evidence . . . [did not] 'so infuse[] the trial with unfairness as to deny due process of law.'"  <u>Id.</u> at 75

(quoting Lisenba v. California, 314 U.S. 219, 228 (1941)); see also  McKinnon v.

Superintendent, Great Meadow Correctional Facility, 2009 WL 3863354, at * 2 (2d Cir.

Nov. 19, 2009).

      For the same reason, Petitioner's claim that the admission of evidence of the

November 1999 Hamilton shooting violated New York's law on prior "bad act" evidence

is not cognizable on habeas review.  Furthermore, the introduction of the evidence did not

violate Petitioner's due process rights, given that the evidence was relevant to an issue in

the case — Petitioner's identity — which, as the Appellate Division found, "was still

potentially at issue notwithstanding the reference to [and eventual assertion of] a

justification defense in [Petitioner's] opening statement."[12]  Brown, 13 A.D.3d at 145;

see also Fed R. Evid. 404(b) ("Evidence of other crimes [is admissible] . . . as proof of

motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake

or accident . . . .").  Although the Hamilton shooting played an important role in the trial,

the judge's instructions on the permissible use of the evidence, which the jury is

presumed to have followed, properly addressed any risk of unfair prejudice.

Accordingly, the introduction of the evidence and its use at trial did not "so infuse[ ] the

trial with unfairness as to deny due process of law."  Estelle, 502 U.S. at 75.

---

[12] The Appellate Division's decision did not address the prosecution's use of the Hamilton
shooting to rebut Petitioner's claim of self-defense (the defense he advanced as to all three
shootings, all occurring within a period of eight months).  This use, to rebut a defendant's
explanation of an innocent state of mind, appears to be, in any event, well-recognized in New
York. See People v. Ingram, 71 N.Y.2d 474, 480 & n.2 (1988) (explaining that defendant's
presence at a second robbery was "relevant to show the improbability of [defendant's] claims of
unwitting complicity" in either of the robberies) (emphasis in original), citing 2 Wigmore on
Evidence § 321, at 285 (Chadbourn rev. 1979) ("[I]t is the repetition . . . that is significant, and a
subsequent instance reduces the probability of innocence . . . .").

Therefore, the Appellate Division's decision denying Petitioner's appeal on the basis of the introduction of uncharged crime evidence was not an unreasonable application of clearly established federal law.

      C.   <u>Petitioner's Abuse of Discretion Claim</u>

Petitioner claims that the trial court abused its discretion in refusing defense counsel's attempt to introduce Mr. Roman's prior statements to undermine his credibility, and thereby bolster Petitioner's claim of self-defense.

The Appellate Division denied the claim summarily as "without merit," and, for the reasons stated above, Petitioner's challenge to the trial judge's evidentiary ruling is not cognizable on habeas review.  The Court notes, in any event, that the trial judge's ruling appears to have been an appropriate application of the well-established rule that precludes direct evidence of a so-called "collateral matter," evidence that might undermine a witness's credibility generally, but that is not probative of any material issue at trial, to wit, Petitioner's claim of self-defense.  <u>See, e.g.</u>, <u>People v Aska</u>, 91 N.Y.2d 979, 981 (1998).


**<u>CONCLUSION</u>**

The petition for a writ of habeas corpus is DENIED.  (Dkt. No. 2.)  The Court, however, issues a certificate of appealability with respect to Petitioner's <u>Batson</u> claim, as Petitioner has made a "substantial showing of a denial of federal right," such that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner."  The Court declines to issue a certificate of appealability as to

Petitioner's remaining claims.  <u>Love v. McCray</u>, 413 F.3d 192, 195 (2d Cir. 2005).

Petitioner is provided with a copy of all unpublished decisions cited in this Order.

   The Clerk of the Court is directed to close this case.  Any pending motions are

moot.

     SO ORDERED.

Dated: New York, New York
    March **29**, 2010

            Kimba M. Wood
          United States District Judge